Filed 9/7/16  P. v. Shorter CA3

NOT TO BE PUBLISHED

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C072977 |
| Plaintiff and Respondent, | (Super. Ct. No. 09F09113) |
| v. | |
| SHANON SHORTER et al., | |
| Defendants and Appellants. | |
| THE PEOPLE, | C073919 |
| Plaintiff and Respondent, | (Super. Ct. No. 09F09113) |
| v. | |
| GENNEL EDWARD MILES, JR., | |
| Defendant and Appellant. | |

Defendants Shanon Shorter, Derrick Sam, and Gennel Edward Miles, Jr., lured Timothy Brodie to defendant Sam's house in south Sacramento, under the ruse of a marijuana transaction.  They tied him up and beat him savagely.  And they drove

1

Brodie's Ford Excursion back to Brodie's house, where they broke into the house, tied up Brodie's wife, and stole the marijuana growing there. Later that evening, they took Brodie to Rancho Cordova, where they shot and killed him. The next day, Brodie's Excursion was burned in Carmichael.

Convicted variously of robbery, kidnapping, carjacking, torture, murder, and arson and sentenced to both determinate and indeterminate terms, including life without the possibility of parole, defendants appeal. They contend, again variously (meaning that some contentions do not apply to all defendants) that: (1) the trial court improperly admitted hearsay statements; (2) the court improperly excluded third party culpability evidence; (3) the court abused its discretion in denying defendant Sam's motion for mistrial; (4) the evidence was insufficient to support the convictions and a special-circumstance finding; and (5) cumulative prejudice requires reversal.

We conclude that there was insufficient evidence to support the convictions of defendants Shorter and Miles for arson of the Excursion. We therefore strike those convictions as to defendants Shorter and Miles, along with the associated prison terms. Finding no other prejudicial error, we affirm the judgments as modified.

FACTS AND BACKGROUND

In 2008, Timothy and Tiffany Brodie, with their son, lived on Lemondrop Court in south Sacramento, where Timothy Brodie (we'll refer to him as "Brodie") grew marijuana. They owned a Ford Excursion, which they bought with casino winnings, and they kept the remaining $8,000 of winnings hidden under their carpet. Brodie, along with Anthony Silva and defendant Sam, grew and sold marijuana.

In November (all dates are in 2008, unless otherwise specified), defendant Sam was arrested for assaulting his girlfriend, Dominique Buffington, at defendant Sam's house. The arresting officer observed fresh drops of blood on the carpet. While defendant Sam was incarcerated for the assault, Brodie and Silva moved marijuana that

2

had been growing in defendant Sam's house over to Brodie's house. Defendant Sam was released from custody on December 9.

*December 19*

Defendant Sam, who lived on Emerald Creek Court, close to Brodie's house, called Brodie at approximately 9:00 p.m. on December 19. After the call, Brodie told his wife that he was going to sell some marijuana and would be right back. He left in the Excursion and took a garage door opener.

About 15 minutes after Brodie left, Tiffany Brodie heard the garage door opening. Three men then broke into the house from the garage. They were African-Americans and were wearing dark clothing, ski masks, and gloves. One had a small handgun, and another had a shotgun.

The men tied up Tiffany Brodie and left her and her son on a bed while they cut the marijuana plants and hauled them out of the house. While she was tied up on the bed, one of the men talked to her, referring to her as "ma." The man also referred to her husband as "Tim." The men finally left the house, and she was able to untie herself.

Tiffany Brodie called Brodie's cell phone at 10:08 p.m., but no one answered. She left the house and went to Silva's house. But she did not call 911 because the men told her not to call the police and because marijuana had been growing in the house. She told Silva's wife that one of the men had called her "ma," and Silva's wife told her that defendant Sam uses the word "ma," which Tiffany Brodie then remembered.

Meanwhile, defendants were moving toward Rancho Cordova, specifically the Cobblestone Apartments, as shown by their cell phone records. At 10:40 p.m., Brodie's Excursion was at the Cobblestone Apartments, where defendant Miles lived. Brodie was shot six times, and he died in the parking lot of the apartments.

*Brodies' House after the Crimes*

Early in the morning on December 20, Tiffany Brodie returned to her house to retrieve diapers and the money from under the carpet. Later that day, Silva, with the help

3

of others, brought a U-Haul truck to the Brodies' house and took away everything associated with the marijuana grow.

*Defendant Miles's Statements*

Also on the morning after the murder, defendant Miles called his friend Robert Collins, who was in Reno. Collins related the conversation to his girlfriend Brittney Ashcraft. Defendant Miles said that he was involved in the robbery and killing of a man. Defendants Miles, Shorter, and Sam lured the victim to defendant Sam's house, where they tied him up. They then took the victim's car over to the victim's house, where they used the garage door opener to get inside. They tied up the victim's wife and child and took the marijuana at the house. Later, the three men took the victim and his car to defendant Miles's apartment complex, and defendant Miles shot the victim.

*Arson of Excursion*

At 7:40 p.m. on December 20, Brodie's Excursion was found on fire in Carmichael on Wayside Lane. Defendant Miles's cell phone had been in that area five hours earlier, at around 2:54 p.m., and defendant Sam's cell phone was in that area at 7:06 p.m., shortly before the fire.

*Autopsy*

Brodie was shot six times, causing him to bleed to death. But there were also many other injuries on his body: lacerations and abrasions on his legs, possibly caused by a belt, as well as lacerations, abrasions, and bruising on his head. Brodie's skull was fractured into pieces and significantly damaged from as many as seven blunt force blows.

The head injuries likely occurred before Brodie was shot.

*Defendant Sam's House*

In January 2009, defendant Sam's house was examined and Brodie's blood was found on the dining room ceiling. A pathologist testified that the blood on the ceiling could have been cast off while Brodie suffered repeated blunt force injuries to the head. Carpeting that had been in the dining room in November 2008 was missing. Fibers found

4

on duct tape on Brodie when he died and on a roll of duct tape in the burnt Excursion matched the carpet in defendant Sam's house.

Additional evidence is recounted in the discussion as it becomes relevant.

*Proceedings*

Defendants were tried by jury. The first trial ended in a mistrial after the jury deadlocked. A second trial resulted in verdicts.

Defendants were convicted and sentenced as follows:

Defendant Derrick Sam

- Carjacking – base term – nine-year determinate term (§ 215; count six) (this and later unlabeled code citations are to the Penal Code);
- Kidnapping – one-year eight-month consecutive determinate term (§ 207, subd. (a); count three);
- Arson – eight-month consecutive determinate term (§ 451, subd. (d); count five);
- First degree murder with a robbery murder special circumstance – consecutive indeterminate term of life without possibility of parole (§§ 187, subd. (a), 190.2, subd. (a)(17); count one); and
- Torture – consecutive indeterminate term of life with minimum parole eligibility after seven years (§ 206; count four).

Defendant Sam's aggregate sentence was a determinate term of 11 years four months, followed by consecutive indeterminate terms of life with parole eligibility after seven years and life without possibility of parole.

Defendant Sam was also convicted of robbery with a finding that the robbery was committed in concert (§§ 211, 213, subd. (a)(1)(A); count two), but punishment was stayed because the robbery was the basis for the special circumstance. Terms for enhancements were stayed.

The jury found not true, as to defendant Sam, the special-circumstance allegations of kidnapping murder and torture murder. (§ 190.2, subd. (a)(17) & (18).)

5

Defendant Shanon Shorter

- Carjacking – base term – nine-year determinate term (§ 215; count six);

- Kidnapping – one-year eight-month consecutive determinate term (§ 207, subd. (a); count three);

- Arson – eight-month consecutive determinate term (§ 451, subd. (d); count five);

- First degree murder with a robbery murder special circumstance – consecutive indeterminate term of life without possibility of parole (§§ 187, subd. (a), 190.2, subd. (a)(17); count one); and

- Torture – consecutive indeterminate term of life with minimum parole eligibility of seven years (§ 206; count four).

Defendant Shorter's aggregate sentence was a determinate term of 11 years four months, followed by consecutive indeterminate terms of life with parole eligibility after seven years and life without possibility of parole.

Defendant Shorter was also convicted of robbery with a finding that the robbery was committed in concert (§§ 211, 213, subd. (a)(1)(A); count two), but punishment was stayed because the robbery was the basis for the special circumstance. Terms for enhancements were stayed.

The jury acquitted defendant Shorter of possession of a firearm by a felon (§ 12021, subd. (a)(1); count eight) and found not true the special-circumstance allegations of kidnapping murder and torture murder (§ 190.2, subd. (a)(17) & (18)).

Defendant Gennel Edward Miles, Jr.

- Carjacking – base term – 18-year determinate term (§ 215; count six) (the determinate terms were doubled under the "Three Strikes" law because defendant Miles had a prior serious felony conviction. (§ 667, subd. (e)(1)));

- Kidnapping – three-year four-month consecutive determinate term (§ 207, subd. (a); count three);

6

- Arson – one-year four-month consecutive determinate term (§ 451, subd. (d); count five);

- Prior serious felony conviction enhancement – five-year consecutive determinate term (§ 667, subd. (a)); and

- First degree murder with a robbery murder special circumstance – consecutive indeterminate term of life without possibility of parole (§§ 187, subd. (a), 190.2, subd. (a)(17); count one).

Defendant Miles's aggregate sentence was for a determinate term of 27 years eight months, followed by a consecutive indeterminate term of life without possibility of parole.

Defendant Miles was also convicted of robbery with a finding that the robbery was committed in concert (§§ 211, 213, subd. (a)(1)(A); count two), but punishment was stayed because the robbery was the basis for the special circumstance. Terms for enhancements were stayed.

The jury acquitted defendant Miles of torture (§ 206; count four) and possession of a firearm by a felon (§ 12021, subd. (a)(1); count seven) and found not true the special-circumstance allegations of kidnapping murder and torture murder (§ 190.2, subd. (a)(17) & (18)).

## DISCUSSION

### I

### *Admission of Defendant Miles's Statements*

### (All Defendants)

Defendants contend that the trial court erred by admitting evidence of statements made by defendant Miles to Robert Collins, who related the statements to Brittney Ashcraft, concerning the events surrounding the Brodie murder and defendants' involvement in those events. We conclude that the trial court neither abused its discretion nor violated defendants' constitutional rights in admitting the statements.

7

A. *Background*

Before retrial, the trial court considered motions by defendants to exclude the phone conversation between defendant Miles and Collins, as related by Ashcraft. The court reviewed relevant parts of (1) a DVD of the statement that Ashcraft gave to law enforcement, (2) the reporter's transcript of the preliminary hearing, (3) the reporter's transcript of the Evidence Code section 402 hearing held before the first trial, and (4) the reporter's transcript of the first trial. We need not recount the statement or testimony given on each occasion, but instead provide a summary.

On May 21, 2009, five months after the murder of Timothy Brodie, Brittney Ashcraft was interviewed about an unrelated case. She told the detective that she had information about the Brodie murder, but she did not want to get involved. Two months later, on July 15, 2009, she was interviewed about the Brodie murder. She had difficulty remembering all the details from seven months earlier.

Ashcraft reported that, on December 19, 2008, the date of the Brodie murder, she went with her boyfriend, Robert Collins, to defendant Miles's apartment at the Cobblestone Apartments. Several other people were at the apartment. Ashcraft and Collins left the apartment with defendant Miles and defendant Shorter and traveled to defendant Sam's house. Shortly after that, Ashcraft and Collins left for Reno.

Ashcraft believed she and Collins stayed in Reno for five days, but a receipt from the motel showed that they were there only three days. She remembered that, on the morning after they arrived in Reno, defendant Miles called her cell phone, a number with a 606 prefix. She saw who it was on the caller ID, so she handed it to Collins. After the call, Collins told her what defendant Miles told him. Defendant Miles said that, after Ashcraft and Collins left defendant Sam's house, defendant Miles was involved in the robbery and killing of a man. Defendants Miles, Shorter, and Sam lured the victim to defendant Sam's house, where they tied him up. They then took the victim's car over to the victim's house, where they used the garage door opener control to get inside. They

8

tied up the victim's wife and child and took the marijuana at the house. Later, the three men took the victim and his car to defendant Miles's apartment complex, and defendant Miles shot the victim back.

Ashcraft said that defendant Miles told Collins that defendant Sam "set the whole thing up." Defendant Sam called Brodie to come over, and that is when they tied him up.

After Ashcraft and Collins returned to Sacramento from Reno, Ashcraft learned that defendant Miles told Collins that defendants killed Brodie because he knew defendant Sam. Ashcraft also learned that they burned Brodie's car.

Collins testified at the first trial that he did not hear about the Brodie murder until he and Ashcraft were on their way home from Reno. He received the information in a phone call from a friend named Eric Hale. The phone conversation lasted more than 15 minutes. Collins was worried about defendant Miles, who lived in the apartments where the murder occurred, so he called defendant Miles. That conversation lasted more than 10 minutes. Defendant Miles told Collins that nothing happened to him. Collins denied telling Ashcraft (1) that defendant Miles told him he was involved in the Brodie murder or (2) any of the other facts reported by Ashcraft later.

The records for Ashcraft's phone did not show a call from defendant Miles to her phone on the morning after the Brodie murder. When confronted with this information, Ashcraft said that she was not sure why the call was not on the phone records and that the call may have occurred at some other time.

The trial court admitted the evidence of defendant Miles's statements. It ruled that (1) defendant Miles's statements were declarations against penal interest under Evidence Code section 1230, (2) the statements were not testimonial, and (3) they were sufficiently trustworthy. Concerning the absence of phone records supporting Ashcraft's claim about the call from defendant Miles to Collins, the court said: "The Court is aware that the cell phone records do not provide proof of a call made the day after. But based on the totality of circumstances, the Court is satisfied that the call occurred reasonably close in time to

9

the homicide." On the issue of trustworthiness, the court noted that the conversation between defendant Miles and Collins was between friends and that defendant Miles did not try to minimize his responsibility. Finally, the court found no problem with multiple layers of hearsay. Defendant Miles's statements to Collins were against penal interest, and Collins's statements to Ashcraft were prior statements inconsistent with his claim that he never made the statements.

B.      *Statement Against Penal Interest*

Defendants contend the trial court erred by admitting the statements of defendant Miles because they were not specifically disserving of defendant Miles. They argue that defendant Miles minimized his own responsibility and claimed that defendant Sam "set the whole thing up" and that the reason for killing Brodie was that he knew defendant Sam.

Evidence Code section 1230 allows admission of hearsay evidence if "the statement, when made, . . . so far subjected [the declarant] to the risk of . . . criminal liability, . . . that a reasonable man in his position would not have made the statement unless he believed it to be true."

"The proponent of [evidence of a declaration against penal interest] must show that the declarant is unavailable, that the declaration was against the declarant's penal interest when made and that the declaration was sufficiently reliable to warrant admission despite its hearsay character. [Citation.]" (*People v. Duarte* (2000) 24 Cal.4th 603, 610-611.) "[A]s California courts have held, ' "a declaration against interest may be admitted in a joint trial so long as the statement satisfies the statutory definition and otherwise satisfies the constitutional requirement of trustworthiness." ' [Citations.]" (*People v. Arceo* (2011) 195 Cal.App.4th 556, 575.)

There is no dispute here that defendant Miles was unavailable as a witness.

"The Sixth Amendment's confrontation clause, which is applicable to the states through the Fourteenth Amendment [citation], provides: 'In all criminal prosecutions,

10

the accused shall enjoy the right . . . to be confronted with the witnesses against him.' The confrontation clause 'reflects a preference for face-to-face confrontation at trial . . . ' which is accomplished through cross-examination of witnesses. [Citation.]" (*People v. Greenberger* (1997) 58 Cal.App.4th 298, 326 (*Greenberger*).)

Nevertheless, "the [United States] Supreme Court has recognized that there are competing interests that justify dispensing with confrontation at trial in certain circumstances and permitting the introduction of hearsay evidence." (*Greenberger, supra,* 58 Cal.App.4th at p. 326.) It has identified "two means by which the confrontation clause restricts the range of admissible hearsay. First, the proponent of the evidence must establish the necessity for the introduction of this evidence. This usually, but not always, means that the declarant is unavailable. Second, the hearsay must have adequate indicia of reliability to justify dispensing with the requirement of confrontation. 'The Court has applied this "indicia of reliability" requirement principally by concluding that certain hearsay exceptions rest upon such solid foundations that admission of virtually any evidence within them comports with the "substance of the constitutional protection." . . . [¶] . . . Reliability can be inferred without more in a case where the evidence falls within a firmly rooted hearsay exception. In other cases, the evidence must be excluded, at least absent a showing of particularized guarantees of trustworthiness.' [Citation.]" (*Id*. at p. 327.)

The court in *Greenberger* noted that a declaration against penal interest has "a high degree of trustworthiness justifying its admission into evidence," in that " 'a person's interest in being criminally implicated gives reasonable assurance of the veracity of his statement made against that interest.' " (*Greenberger, supra,* 58 Cal.App.4th at p. 327.)

"There is no litmus test for the determination of whether a statement is trustworthy and falls within the declaration against interest exception. The trial court must look to the totality of the circumstances in which the statement was made, whether the declarant

11

spoke from personal knowledge, the possible motivation of the declarant, what was actually said by the declarant and anything else relevant to the inquiry. [Citations.] [¶] . . . [T]he most reliable circumstance is one in which the conversation occurs between friends in a noncoercive setting that fosters uninhibited disclosures. [Citations.]" (*Greenberger, supra,* 58 Cal.App.4th at pp. 334-335.)

"Evidence Code section 1230 only permits an exception to the hearsay rule for statements that are specifically disserving of the declarant's penal interest. [Citation.] This is not to say that a statement that incriminates the declarant and also inculpates the nondeclarant cannot be specifically disserving of the declarant's penal interest. Such a determination necessarily depends upon a careful analysis of what was said and the totality of the circumstances. [Citations.]" (*Greenburger, supra,* 58 Cal.App.4th at p. 335.)

We review for abuse of discretion a trial court's ruling as to whether the hearsay exception applies. (*People v. Gordon* (1990) 50 Cal.3d 1223, 1250-1251.)

Defendants assert this case is like *People v. Duarte*, *supra*, 24 Cal.4th 603 (*Duarte*). That case, however, is distinguishable.

In *Duarte*, the hearsay declarant and the defendant committed a driveby shooting. After he was arrested, the hearsay declarant told the police that he did not want to kill anybody and " 'shot high' " to avoid harming anyone. (*Duarte, supra,* 24 Cal.4th at p. 613.) In determining that the declaration lacked trustworthiness, the court noted that the declaration was made shortly after the codefendant had been arrested and taken into custody and was therefore " 'made in the coercive atmosphere of official interrogation.' " (*Id.* at p. 617.) The court continued: "Under these circumstances, [the declarant] may have believed that the police had sufficient evidence to link him to the crimes, and that he had little to lose and perhaps something to gain by admitting his role while attempting to minimize his participation and shift primary responsibility to others." (*Ibid*.) The court concluded that the declarant's statements lacked sufficient indicia of trustworthiness to

12

qualify for admission under Evidence Code section 1230 because they were not specifically disserving to the declarant's interests. (*Id.* at p. 618.)

Here, there was no interrogation and no coercive atmosphere. To the contrary, the conversation was between friends. While it is true that defendant Miles implicated the other defendants in his statements, he gave Collins information, not previously known to Collins or, apparently, the authorities, that defendant Miles, himself, was involved in the robbery and killing of Brodie. He even admitted being the shooter. These statements disserved defendant Miles's penal interests and supported the trial court's conclusion that the statements, as a whole, had sufficient indicia of trustworthiness. As a result, the trial court did not abuse its discretion in admitting the statements as declarations against penal interest. Furthermore, the admissions did not violate defendants' confrontation and due process rights because they were admissible under a firmly rooted hearsay exception and they had sufficient indicia of trustworthiness. (*Greenberger, supra,* 58 Cal.App.4th at pp. 327, 334-335.)

Defendant Shorter makes an additional argument against reliability of defendant Miles's statements. He claims that "the only information purportedly conveyed by [defendant] Miles to Collins to Ashcraft regarding [defendant Shorter's] specific culpability for the charged crimes was that he was 'involved' [record citation]; the statement otherwise was void of detail as to [defendant Shorter's] particularized conduct[.]" (Italics omitted.) We fail to see, and defendant Shorter does not explain, why this characteristic of defendant Miles's statements makes them less reliable. While it was a good point to make with the jury, it does not make the statements inadmissible.

C.    *Reliability of Brittney Ashcraft's Statements*

Defendants Miles and Shorter contend that Brittney Ashcraft's statements (and testimony) concerning what Collins told her about his conversation with defendant Miles were not sufficiently reliable to be admissible as a matter of due process and confrontation rights because the phone records did not support her recollection about

13

when the call was made. Defendant Miles goes so far as to say that "Ashcraft's report of the 'phantom' call was demonstrably false." To the contrary, there was sufficient evidence to sustain the trial court's reliability determination.

The trial court, in ruling on the admissibility of Ashcraft's statements, said: "The Court is aware that the cell phone records do not provide proof of a call made the day after [the murder]. But based on the totality of the circumstances, the Court is satisfied that the call occurred reasonably close in time to the homicide."

As we consider the reliability of Ashcraft's statements, we start with the recognition that Ashcraft's trial testimony was not hearsay. Her testimony included hearsay of other declarants, which we have discussed, but her testimony, itself, did not constitute hearsay. (See Evid. Code, § 1200, subd. (a) [hearsay as "evidence of a statement that was made other than by a witness while testifying at the hearing"].) She was fully subject to cross-examination, and the cases discussing the admissibility of hearsay cited by defendants are inapplicable.

To the extent a video recording of her interview was used, that evidence constituted hearsay because it was not in-court testimony. However, the concerns associated with hearsay statements were greatly diminished because she was subject to cross-examination at trial, which allowed defendants to test the reliability of the statements Ashcraft made in the video recording. As a matter of constitutional law, "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." (*Crawford v. Washington* (2004) 541 U.S. 36, 59, fn. 9 [158 L.Ed.2d 177, 197].) As the trial court said at the pretrial hearing, "[b]oth witness Collins and witness Ashcraft will be rigorously and vigorously examined and cross-examined as to their statements. The jury is the trier of facts and determines the credibility of witnesses. And they will have the opportunity to decide whether any of these statements were made in whole or in part and whether they should believe any of those statements in whole or in part."

14

Under these circumstances, the fact that the phone records did not corroborate Ashcraft's statements did not render those statements inadmissible. As the trial court noted, there was communication between Collins and defendant Miles within a reasonable time after the Brodie murder. And the evidence supports an inference that Collins was with Ashcraft when the communication occurred. That Ashcraft, when questioned about the call seven months later (in the case of her recorded statement) or years later (in the case of trial), remembered the call being on a specific phone at a specific time that was not supported by phone records, did not make the statement so unreliable that it was constitutionally inadmissible.

The trial court did not err in admitting the statements of defendant Miles, Collins, and Ashcraft concerning the events surrounding the Brodie murder.

II

*Third Party Culpability Evidence*

(All Defendants)

In response to a motion to admit evidence of third party culpability, the trial court denied the motion but assured defendants it would reconsider the ruling if evidence were to be brought to its attention justifying admission of third party culpability evidence. On appeal, defendants contend the trial court erred by excluding evidence of third party culpability. We conclude that there was no exclusion of specific evidence and, in any event, the facts do not support a finding that the trial court abused its discretion.

A.    *Law Concerning Third Party Culpability Evidence*

Under the federal and California Constitutions, a criminal defendant has the right to present witnesses and other evidence in his or her defense. (*Chambers v. Mississippi* (1973) 410 U.S. 284, 302 [35 L.Ed.2d 297, 312-313]; *People v. Hansel* (1992) 1 Cal.4th 1211, 1219.) That includes evidence of third party culpability. (*People v. Basuta* (2001) 94 Cal.App.4th 370, 386-387.)

15

"To be admissible, the third-party evidence need not show 'substantial proof of a probability' that the third person committed the act; it need only be capable of raising a reasonable doubt of defendant's guilt. At the same time, we do not require that any evidence, however remote, must be admitted to show a third party's possible culpability." (*People v. Hall* (1986) 41 Cal.3d 826, 833 (*Hall*).) " '[E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime.' " (*People v. Avila* (2006) 38 Cal.4th 491, 578, quoting *Hall, supra,* 41 Cal.3d at p. 833.)

"[C]ourts should simply treat third-party culpability evidence like any other evidence: if relevant it is admissible ([Evid. Code,] § 350) unless its probative value is substantially outweighed by the risk of undue delay, prejudice, or confusion ([Evid. Code,] § 352)." (*Hall, supra*, 41 Cal.3d at p. 834.) "As a general matter, the ordinary rules of evidence do not impermissibly infringe on the accused's right to present a defense. Courts retain, moreover, a traditional and intrinsic power to exercise discretion to control the admission of evidence in the interests of orderly procedure and the avoidance of prejudice. [Citations.]" (*Ibid*.)

Although a defendant is constitutionally entitled to present "a complete defense" (*California v. Trombetta* (1984) 467 U.S. 479, 485 [81 L.Ed.2d 413, 420]), that right does not encompass the ability to present evidence unfettered by evidentiary rules (*People v. Brown* (2003) 31 Cal.4th 518, 538). "[T]he Constitution permits judges 'to exclude evidence that is "repetitive . . . , only marginally relevant" or poses an undue risk of "harassment, prejudice, [or] confusion of the issues." ' " (*Holmes v. South Carolina* (2006) 547 U.S. 319, 326-327 [164 L.Ed.2d 503, 510, 511 [stating evidentiary rules that preclude the admission of third party culpability evidence insufficiently connecting the third person to the crime are "widely accepted"].) When a trial court exercises its discretion to exclude evidence and does not abuse that discretion, the exclusion of the

16

evidence (including proffered third party culpability evidence), does not impermissibly infringe on a defendant's federal constitutional rights. (*People v. Prince* (2007) 40 Cal.4th 1179, 1243.)

Under the abuse of discretion standard, we will not disturb a trial court's ruling unless discretion was exercised in an arbitrary, capricious, or patently absurd manner, resulting in a manifest miscarriage of justice. (*People v.Rodriguez* (1999) 20 Cal.4th 1, 9-10.)

B.     *Background*

On appeal, defendant Sam asserts that the trial court erred by denying his motion to admit third party culpability evidence. In support, he cites a written motion he filed during the first trial, which was before Judge Roland L. Candee. In that motion, he made an offer of proof concerning the evidence he wished to introduce. Defendant Sam fails to establish that Judge Maryanne G. Gilliard, who presided over the second trial, was ever made aware of the motion or offer of proof from the first trial, and he makes no argument that a motion filed in a different trial before a different judge should be considered on appeal after a second trial. We know of no such authority.[1]

In his opening brief on appeal, defendant Sam cites evidence concerning Anthony Silva that was admitted during the second trial, after Judge Gilliard had denied a motion for admission of third party culpability evidence, but he does not assert that, during trial, he or any other defendant renewed the motion to admit third party culpability evidence to take into account the evidence introduced later at trial. Therefore, the evidence admitted later at trial is not relevant to our consideration of whether the trial court erred by denying a pretrial motion. When we review a trial court's ruling concerning admission of

---

[1]     The Attorney General's brief does not mention this absence of an offer of proof.

17

evidence, we consider only the evidence brought to the court's attention before it made the ruling. (*People v. Hartsch* (2010) 49 Cal.4th 472, 491.)

Because of this procedural history, defendant Sam's argument that the trial court erred by excluding evidence of third party culpability fails from the inception, as there is no evidentiary support.

On the other hand, defendant Miles filed a motion before the second trial, which motion Judge Gilliard considered and denied. In fact, defendant Sam refers to the oral record of this ruling, while failing to notify us that the ruling was not based on the motion he filed during the first trial and failing to identify the evidence that was presented to Judge Gilliard in connection with her ruling on defendant Miles's motion during the second trial. In ruling on the motion, Judge Gilliard said, "I've read [defendant Miles's] motion and I've read the People's opposition."

We therefore turn to defendant Miles's motion and the prosecution's opposition to determine what Judge Gilliard was asked to consider.

Defendant Miles's written motion to admit third party culpability evidence does not seek to introduce any specific evidence. Read as a whole, the motion simply asks the court to keep an open mind concerning the prospect of third party culpability evidence. Defendant Miles wrote: "At this time Defendant Miles is not seeking to offer evidence for the singular purpose of implicating a third party not currently charged for these offenses. However, even as this matter proceeds to trial, [defendant] Miles requests that this court not foreclose any direct or circumstantial evidence that would link the aforementioned individuals [which included Tiffany Brodie, Anthony Silva, and Lynette Silva], or any other, to the crimes alleged should the defense present an offer of proof . . . ."

In its opposition to the motion, the prosecution shed a little more light on who Anthony Silva was. Silva, who is Caucasian, and Brodie had been friends for years and were partners in marijuana cultivation. After the home invasion, Tiffany Brodie went to

18

Silva's house for protection and help, where Silva was awakened. Silva borrowed Tiffany's phone and left for awhile. Later, about four hours after the murder, Tiffany's phone pinged off a cell tower near where Brodie was murdered. This happened while police were on the scene investigating the murder. The next day, Silva went with a U-Haul truck to the Brodies' residence at Tiffany's bidding and cleaned up, but he claimed he did not haul anything away.

At the hearing on the motion, counsel for defendant Miles reiterated that he was not seeking to have the court admit any specific evidence but only asked the court "not to prejudge the facts of this case" and "keep an open mind." The other two defendants joined in the motion.

The trial court ruled as follows: "Based on what I've read in [defendant Miles's] motion, I do not see any reason to permit third party culpability evidence to come in front of the jury. That being said, this does not preclude you . . . . I know you're continuing to do investigation. I will continue to keep an open mind." There was then some discussion about whether the prosecution or the defense would call Anthony Silva or Lynette Silva to testify. The prosecution said no, and counsel for defendant Sam added: "We won't either in light of [the court's] ruling. If they did [testify], they would take the Fifth Amendment like they did last time."

C.     *Analysis*

Defendants cannot establish error because there was no exclusion of specific evidence.

"A verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error or errors is of the opinion that the error or errors complained of resulted in a miscarriage of justice and it appears of record that: [¶] (a) The substance, purpose, and relevance of the excluded evidence was made known to

the court by the questions asked, an offer of proof, or by any other means[.]" (Evid. Code, § 354.)

"Given this record, the rule requiring a specific offer of proof in order to preserve an evidentiary ruling for appeal comes into play. (Evid. Code, § 354.) An offer of proof should give the trial court an opportunity to change or clarify its ruling and in the event of appeal would provide the reviewing court with the means of determining error and assessing prejudice. [Citation.] To accomplish these purposes an offer of proof must be specific. It must set forth the actual evidence to be produced and not merely the facts or issues to be addressed and argued. [Citations.]" (*People v. Schmies* (1996) 44 Cal.App.4th 38, 53.)

The trial court denied the motion to admit evidence of third party culpability because there was no specific evidence tendered. The court also committed to reconsidering that ruling if defendants brought specific evidence to its attention. Since there was no specific evidence tendered, it cannot be argued that the trial court abused its discretion in excluding any specific evidence, even if the motion set forth the general issue to be considered.

Even if we assume defendants were asking the trial court to admit evidence consistent with the summary included in the prosecution's opposition to the motion, there is no error here. Tiffany Brodie testified that the home invaders were African-American, but Silva was Caucasian. Silva was at home asleep when Tiffany arrived there. And, even if he took Tiffany's phone to the vicinity of where Brodie was murdered, it was four hours after the murder. None of these circumstances connect Silva to the home invasion or crimes against Brodie. That Silva went to the Brodie residence at Tiffany's bidding to clean up from the marijuana grow on the next day also does not connect him to the crimes. The court did not abuse its discretion in excluding this evidence.

Within defendant Sam's argument concerning third party culpability evidence, he makes the following unadorned statement: "The court also precluded the defense from

20

cross-examining Tiffany Brodie about why her phone was in the general vicinity of the crime scene on the night of the murder during the time the phone was in Silva's possession."

The record shows that the trial court sustained the prosecution's relevance objection to the following question on cross-examination by counsel for defendant Shorter: "Did you ever take your phone out to Rancho Cordova that night?" But there is nothing in the record indicating that defendant Shorter, or any other defendant, made an offer of proof and argument to the trial court concerning the relevance of the anticipated testimony. Furthermore, defendant Sam does not explain on appeal why exclusion of this testimony specifically violated his right to introduce evidence of third party culpability.

### III

### *Denial of Mistrial Motion*

#### (Defendant Sam)

Defendant Sam contends the trial court abused its discretion in denying his motion for mistrial after Tiffany Brodie testified that defendant Sam "didn't have a clean rap sheet" and "was in a domestic violence." We conclude the trial court did not abuse its discretion.

" 'A mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' [Citation.] Although most cases involve prosecutorial or juror misconduct as the basis for the motion, a witness's volunteered statement can also provide the basis for a finding of incurable prejudice. [Citation.]" (*People v. Wharton* (1991) 53 Cal.3d 522, 565 (*Wharton*).)

In *Wharton*, the witness had visible facial injuries. (*Wharton, supra,* 53 Cal.3d at p. 563.) He was questioned about being beaten up in jail and testified defendant did not do it. But, when asked to explain what a snitch was, he blurted out that defendant " 'got

21

the word out.' " Defendant moved for a mistrial, claiming the witness's assertion was extremely prejudicial because defendant was charged with a violent crime. (*Id*. at p. 564.) The trial court denied the motion for a mistrial and admonished the jury to disregard the statement the witness blurted out. The court also admonished the jury that defendant had nothing to do with the witness's injuries. On cross-examination, the witness explained his injuries were caused by a former neighbor following a dispute over rent. (*Id*. at p. 565.) The Supreme Court found no abuse of discretion in denying the motion for a mistrial. The court found no incurable prejudice because the witness did not directly implicate the defendant in the beating, the trial court gave a direct and pointed admonishment four days later, and on cross-examination the witness clarified that the defendant had no participation in the beating by placing the blame on another for unrelated reasons. (*Id*. at p. 566.)

During cross-examination of Tiffany Brodie by counsel for defendant Shorter, counsel asked her whether her husband associated with criminals. In answering the question, she said that defendant Sam "didn't have a clean rap sheet." Later, when asked about who owned the marijuana crop in the Brodie residence, she replied that her husband told her that the plants had been at defendant Sam's house and that defendant Sam "was in a domestic violence, and they had to move the plants out . . . ." Neither statement drew an objection.

In response to defendant Sam's motion for mistrial based on the statements, the trial court said: "I don't think this passing reference amounts to a violation of [defendant] Sam's due process rights to a fair trial. [¶] I agree with [the prosecutor] in part that this jury knows that Officer Leonard was called to [defendant Sam's house], and the person who answered the door was a bleeding woman. And that subsequent to that he saw blood around the house and [defendant] Sam was arrested. So not to put too fine a point on it, I don't think the jury is stupid. I think they will figure this out. As much as courts like to sanitize the truth, sometimes the truth nevertheless comes out. And so – but

22

I do not think this amounted to a violation of [defendant] Sam's constitutional rights." Defendant Sam did not ask the trial court to admonish the jury.

The trial court did not abuse its discretion in determining that the witness's statements about defendant Sam's rap sheet and the domestic violence situation did not result in incurable prejudice. First, the statements did not go directly to defendant Sam's guilt as to the charged crimes. Second, as the trial court noted, the evidence of Buffington's injuries and the blood inside defendant Sam's house was relevant and admissible because of the other blood found in the house, as well as the missing carpet. Also, the jury was properly apprised that defendant Sam was arrested on that occasion (because it was relevant to where the marijuana he was growing ended up). Therefore, the fact that defendant Sam did not have "a clean rap sheet" and "was in a domestic violence" added little to the jury's proper knowledge concerning defendant Sam. And third, the remarks were brief and paled in comparison to the evidence of defendant Sam's participation in the charged offenses.

Under these circumstances, the trial court did not abuse its discretion in determining that the witness's statements did not cause prejudice.

IV

*Sufficiency of Evidence*

(Defendants Shorter and Miles)

Defendants Shorter and Miles contend that the evidence was not sufficient to support their convictions on various counts. Defendant Shorter argues that there was insufficient evidence to convict him of any of the crimes. Also, defendant Shorter argues that the evidence was insufficient for a true finding on the special-circumstance allegation of murder while engaged in robbery. Defendant Miles argues that there was insufficient

23

evidence to convict him of arson.  The sufficiency of evidence argument has merit only as to the arson convictions.**2**

A.      *Law Concerning Sufficiency of Evidence*

" 'In considering a claim of insufficiency of evidence, a reviewing court must determine "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." [Citations.]'  [Citation.]  'The appellate court presumes in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence.  [Citations.]'  [Citation.]  'Although it is the jury's duty to acquit a defendant if it finds the circumstantial evidence susceptible of two reasonable interpretations, one of which suggests guilt and the other innocence, it is the jury, not the appellate court that must be convinced of the defendant's guilt beyond a reasonable doubt.'  [Citation.]  Simply put, if the circumstances reasonably justify the jury's findings, the judgment may not be reversed simply because the circumstances might also reasonably be reconciled with a contrary finding.  [Citations.]" (*People v. Farnam* (2002) 28 Cal.4th 107, 142-143, italics omitted.)

B.      *Robbery, Kidnapping, Torture, Carjacking, and Murder*

Recognizing that defendant Miles's statements implicated him in all of the December 19 crimes of which he was convicted, defendant Shorter claims the evidence was nonetheless insufficient to establish his guilt because the evidence did not establish that he was present and involved in the crimes.  He argues:  (1) defendant Miles's statements, as conveyed in Ashcraft's statement and testimony at trial, identified defendant Shorter as a participant but mostly referred to "they" when recounting the

_____

**2**      In his opening brief, defendant Sam joined the arguments of the other defendants. (Cal. Rules of Court, rule 8.200(a)(5).)  However, in his reply brief, he made it clear that the joinder did not extend to the sufficiency of evidence claims.

24

crimes committed, not to defendant Shorter specifically; (2) two of the three men who invaded the Brodie home did not match defendant Shorter's physical appearance; (3) no fingerprint or DNA evidence connected defendant Shorter to the crimes; and (4) the phone records support an inference that defendant Shorter did not flee the area of the Cobblestone Apartments with defendant Sam after Brodie was killed.[3]

While these were observations to be made to the jury, the remainder of the evidence supports the convictions: (1) defendant Miles said that defendants Shorter and Sam, as well as a person referred to as "T," were "involved in everything that occurred that night including the murder;" "they all went and did it"; (2) consistent with defendant Shorter's claim that two of the three men who invaded the Brodie home did not match defendant Shorter's physical appearance, the description of at least one of the home invaders matched defendant Shorter's description; (3) defendant Shorter's phone records showed that he was in the area of the Brodies' and defendant Sam's houses around the time of the home invasion and kidnapping and that he traveled to the area of the Cobblestone Apartments by 10:21 p.m., about 20 minutes before the murder.

Construed in the light most favorable to the judgment, this evidence was sufficient to convict defendant Shorter of the kidnapping, torture, carjacking, and murder of Brodie because he was present and involved in the crimes.

Defendant Shorter also argues that, because the evidence does not establish that he was present, the only way to convict him was as an aider and abettor. He further argues that the evidence was insufficient to support his conviction of the crimes on an aiding and abetting theory. To the contrary, the evidence, as noted, was sufficient to establish that

---

[3] Defendant Shorter's recitation of the evidence in the light more favorable to himself, rather than to the judgment, could be viewed as a forfeiture of the sufficiency of evidence argument, as the Attorney General suggests. (See *People v. Battle* (2011) 198 Cal.App.4th 50, 62.) In any event, the contention that the evidence was insufficient to support the convictions is without merit.

he was present and involved in the crimes as they happened.  Therefore, we need not consider the aiding and abetting theory.

C.    *Arson*

Defendants Shorter and Miles contend that the evidence was insufficient to support their convictions for arson relating to the burning of Brodie's Excursion.  We conclude that the evidence was not sufficient and that the convictions of defendants Shorter and Miles for arson must be reversed.

As noted above, there was evidence that defendants Shorter and Miles participated with defendant Sam in the robbery, kidnapping, torture, carjacking, and murder.  Defendant Miles's statement, as recounted through Ashcraft's statement and testimony, established that the three men worked together in committing the crimes.  However, Ashcraft's statement and testimony did not extend to who committed the arson.  Instead, she said that she heard about the arson after she and Collins returned to the Sacramento area after their trip to Reno.  There is no indication in that statement of who committed the arson.

The murder was committed at the Cobblestone Apartments in Rancho Cordova on December 19, at approximately 10:40 p.m.  There was evidence that Brodie's Ford Excursion was present at the Cobblestone Apartments at the time of the murder and sped away soon after.  The next evening, December 20, at 7:41 p.m. (21 hours after the murder), Brodie's Excursion was set on fire on Wayside Lane in Carmichael, about eight miles away from the Cobblestone Apartments.

Records for defendant Sam's cell phone showed that on December 20, the day after the murder, he traveled north from the area of his residence in south Sacramento, arriving in the vicinity of Wayside Line in Carmichael at 7:06 p.m., shortly before the Excursion was set on fire.  The records also show that soon after arriving in the vicinity of Wayside Lane, defendant Sam returned to south Sacramento.  This evidence is consistent with a factual finding that defendant Sam set the Excursion on fire.

Records for defendant Miles's cell phone showed that on December 20, he was in the vicinity of Wayside Lane at 2:54 p.m., about five hours before the Excursion was set on fire. However, the records show that by 5:00 p.m. defendant Miles was in south Sacramento. At 7:30 p.m. he was near the Cobblestone Apartments in Rancho Cordova, and he received a call from defendant Shorter at 7:44 p.m., which lasted 42 seconds.

The evidence that defendant Miles was in the vicinity where the Excursion was eventually burned, along with the evidence that defendant Miles was involved with defendant Sam in the crimes of the previous evening, tends to incriminate defendant Miles generally because it shows he may have been involved in getting the Excursion to that location or, at least, visiting that location. However, it does not lead to a reasonable inference that defendant Miles committed or aided and abetted in the commission of the arson. There was no evidence that defendant Miles and defendant Sam were together after the murder or that they communicated during that time. While the Attorney General points to evidence that there were 17 calls between the phones of defendants Miles and Sam from December 20, 2008, to January 26, 2009, we have been directed to no evidence of when on December 20 any such call took place or whether one did. It was not enough that, earlier on the day of the arson, defendant Miles visited the place where the Excursion was later set on fire. At most, it established that defendant Miles knew where the Excursion was five hours before the arson. Only speculation supports the conclusions that defendant Miles knew that defendant Sam intended to burn the Excursion and defendant Miles intended to aid and abet that crime.

Records for defendant Shorter's cell phone did not place him in the vicinity of Wayside Lane on December 20. He had the phone conversation with defendant Miles soon after the Excursion was set on fire and three more calls with defendant Miles around midnight that night. The Attorney General points to evidence that there were 23 calls between the phones of defendants Shorter and Sam from December 18, 2008, to

27

December 30, 2008; however, like the evidence connected to defendant Miles, there is no indication in the evidence that any of the calls took place on December 20.

Therefore, the evidence tending to connect defendant Shorter to the arson is even slimmer. He participated with defendants Sam and Miles in the crimes of the previous evening, but there is no evidence that he was with defendant Sam or spoke to him by phone on December 20.

We therefore conclude we must strike the arson convictions of defendants Shorter and Miles.

D.    *Special Circumstance*

Defendant Shorter argues that there was insufficient evidence to support the special-circumstance allegation of murder while committing robbery because there was no evidence that defendant Shorter intended to kill Brodie or that he was at the Cobblestone Apartments when Brodie was murdered. To the contrary, the evidence was sufficient.

Since there was evidence that defendant Miles was the actual shooter, we turn our attention to the law concerning the robbery special circumstance when the defendant is not the actual shooter, as summarized by this court in *People v. Proby* (1998) 60 Cal.App.4th 922 (*Proby*):

"In order to support a finding of special circumstances murder, based on murder committed in the course of robbery, against an aider and abettor who is not the actual killer, the prosecution must show that the aider and abettor had intent to kill or acted with reckless indifference to human life while acting as a major participant in the underlying felony. (§ 190.2, subds. (c), (d).)

"Subdivision (d) of section 190.2, concerning reckless indifference, 'was added by Proposition 115 in order to bring the death penalty into conformity with *Tison v. Arizona* (1987) 481 U.S. 137, 158 [95 L.Ed.2d 127, 144 . . . ]. [Citation.] *Tison* held that the death penalty may be imposed in a case of "major participation in the felony committed,

28

combined with reckless indifference to human life." Put another way, *Tison* held "that the reckless disregard for human life implicit in knowingly engaging in criminal activities known to carry a grave risk of death represents a highly culpable mental state, a mental state that may be taken into account in making a capital sentencing judgment when that conduct causes its natural, though also not inevitable, lethal result." [Citation.]' [Citation.] The term 'reckless indifference to human life' means 'subjective awareness of the grave risk to human life created by his or her participation in the underlying felony.' [Citation.]" (*Proby*, *supra*, 60 Cal.App.4th at pp. 927-928, fn. omitted.)

The jury was properly instructed on these principles.

A " 'major participant' " is one who has a notable or conspicuous role, but need not be a ringleader. (*Proby*, *supra*, 60 Cal.App.4th at pp. 933-934.)

Recently, the California Supreme Court commented on when an aider and abettor is eligible for the death penalty or life imprisonment without possibility of parole, posing a series of questions to test the individual defendant's culpability: "What role did the defendant have in planning the criminal enterprise that led to one or more deaths? What role did the defendant have in supplying or using lethal weapons? What awareness did the defendant have of particular dangers posed by the nature of the crime, weapons used, or past experience or conduct of the other participants? Was the defendant present at the scene of the killing, in a position to facilitate or prevent the actual murder, and did his or her own actions or inaction play a particular role in the death? What did the defendant do after lethal force was used? No one of these considerations is necessary, nor is any one of them necessarily sufficient. All may be weighed in determining the ultimate question, whether the defendant's participation 'in criminal activities known to carry a grave risk of death' (*Tison v. Arizona, supra,* 481 U.S. at p. 157) was sufficiently significant to be considered 'major' (*id*. at p. 152; [citation].)" (*People v. Banks* (2015) 61 Cal.4th 788, 803, fn. omitted.)

29

Here, there is evidence that defendant Shorter was involved in planning the crimes because he participated in them from the home invasion to the eventual murder of Brodie. In other words, his involvement in the earlier crimes provides evidence that he was involved in planning the later crimes. While there is no evidence that defendant Shorter supplied the weapons used to inflict mortal injury on Brodie, there was evidence that defendant Shorter, well before the time of the actual murder, understood the violent nature of the attack on Brodie because the attack on Brodie at defendant Sam's house almost killed Brodie, breaking his skull into pieces. Defendant Shorter was present at the scene of the murder, as we discuss below, and his participation in the crimes up to that point did nothing other than to facilitate the murder. And finally, defendant Shorter did nothing to help Brodie but instead left him in the parking lot to die.

Looking at the evidence supporting these conclusions, we begin with defendant Shorter's claim that his "phone records and cell tower information strongly suggest [he] was not present at the Cobblestone Apartments at the time Brodie was killed." That simply is not true.

Defendant Shorter's cell phone was in the south Sacramento area near defendant Sam's house in the early evening on December 19. Brodie was kidnapped and beaten that evening. Then defendant Shorter's cell phone traveled to Rancho Cordova. At 10:11 p.m., he was about 2.5 miles from the Cobblestone Apartments. At 10:21 p.m., he was in the vicinity of the Cobblestone Apartments, and the shooting took place around 10:40. Therefore, the evidence supports a reasonable inference that defendant Shorter traveled, as did the other defendants, from south Sacramento to the Cobblestone Apartments, transporting the victim, and was present at the shooting.

The evidence is also sufficient to support the jury's determination that defendant Shorter acted with reckless indifference to human life while acting as a major participant in the robbery. Ashcraft said that "they all went and did it." As already discussed, defendant Shorter was involved in the crimes, from beginning to end, on December 19.

30

From his participation in the home invasion to his presence at defendant Sam's house while Brodie was savagely beaten and tortured, the jury reasonably concluded that defendant Shorter was guilty of those crimes. Brodie was already near death when the group, including defendant Shorter, left defendant Sam's house, took Brodie to the Cobblestone Apartments, and shot him. As the trial court noted, "the defendants in this case had an opportunity to pause and reflect such that this was not a period of aberrant behavior. These were separate and distinct locations and separate and distinct acts of violence." Even if defendant Shorter was not the actual shooter, he was a major participant and his actions evinced a reckless indifference for Brodie's life.

The evidence was sufficient to support the true finding on the special-circumstance allegation that defendant Shorter murdered Brodie while committing robbery.

V

*Cumulative Prejudice*

(All Defendants)

Defendants contend that, even if the prejudice caused by the asserted errors was insufficient individually to require reversal, the cumulative prejudice from the errors nonetheless requires reversal as a violation of their constitutional due process rights. Mainly, they argue that the improper admission of evidence resulted in cumulative prejudice. Having found that no evidence was improperly admitted, we conclude that this cumulative prejudice argument is also without merit.

DISPOSITION

The arson convictions of defendants Shorter and Miles (count five) and the associated prison terms are struck. As modified, the judgments as to defendants Shorter and Miles are affirmed.

The judgment as to defendant Sam is affirmed in its entirety.

31

The trial court is directed to prepare an amended abstract of judgment as to each defendant. As to defendants Shorter and Miles, the trial court is directed to amend the abstract of judgment to reflect the modification of the judgment. As to all defendants, the court is directed to amend the abstract of judgment to reflect that each defendant was convicted of robbery in concert and to cite both section 211 and section 213, subdivision (a)(1)(A) of the Penal Code (count two). Finally, the court is directed to send the amended abstracts of judgment to the Department of Corrections and Rehabilitation.


                                                        NICHOLSON            , J.



We concur:


        BLEASE            , Acting P. J.



        BUTZ            , J.


32